CANNON CONSTRUCTION COMPANY,
Inc., Ed. J. Kearns, Company,
Incorporated

v.

The UNITED STATES.

No. 89–57.

United States Court of Claims.

June 7, 1963.

Charles S. White, Indianapolis, Ind., for plaintiffs. J. D. Wright and Davis, Hartsock & Wright, Indianapolis, Ind., were on the brief.

Gerson B. Kramer, Silver Springs, Md., with whom was Asst. Atty. Gen. John W. Douglas, for defendant. Daniel M. Redmond, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

JONES, Chief Judge.

This is a suit to recover damages in the amount of $81,000 for breach of a government contract to rehabilitate an Army hospital. The amount claimed is alleged to have been the loss of profit sustained as the result of Government delays in performance of work under the contract and is in addition to a sum (designated as out-of-pocket losses) previously awarded as an equitable adjustment under the contract's "Suspension of Work" clause. Defendant contends that the equitable adjustment was an accord and satisfaction of plaintiffs' losses from delays and precludes further recovery in this court.

Plaintiffs, the Cannon Construction Company, Inc., and the Ed. J. Kearns Company, Incorporated, acting as joint venturers, entered into a fixed price construction contract with the Department of the Army on March 5, 1951, undertaking therein to furnish all plans, labor, material, and equipment, except for equipment specified to be furnished by the Government, for the rehabilitation and repair of numerous hospital buildings at the U.S. Army Hospital, Camp Atterbury, Indiana.

Performance was to have been completed within 90 days after receiving instructions to commence work, but the contract as modified actually required approximately 2 years to complete.

The original contract price was $696,485, but because of numerous change orders, in the net amount of $195,676.08, not in issue, and an equitable adjustment in the amount of $87,270.92 for losses due to delays, designated as Modification No. 10, the final contract price amounted to $979,432.

The contract included the usual standard clauses pertaining to "Changes," "Changed Conditions," "Extras," "Delays-Damages," and "Termination."

Article 15, the "Disputes" clause, provided that all disputes concerning questions of fact which might arise under the specifications, not disposed of by mutual agreement, should be decided by the contracting officer, with the usual provisions for appeal to the Secretary of the Army, whose decision would be final and conclusive upon the parties.

In addition, Part II of the Specifications contained a "Suspension of Work" clause, which authorized the contracting officer to "order the contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government." It further provided that in the event a suspension of work for an unreasonable time caused additional expense or loss to the contractor, the contracting officer should make an equitable adjustment in the contract price.

The contract called for the installation of many pieces of equipment to be furnished by the Government through Medical Supply and Quartermaster channels. In many instances, neither the equipment nor necessary details describing it were made available to the contractor until many months after the original completion date of June 5, 1951. During the first 15 months of work, and prior to June 14, 1952, when the contracting officer ordered the contract suspended, plaintiffs sustained substantial losses as a result of the Government delays in performing its express and implied obligations under the contract. Delays during this period included the defendant's failure to provide plaintiffs with continuous access to certain job worksites, its failure to make orderly and timely delivery of Government-furnished equipment for installation, and its failure to supply accurate advance rough-in specifications of the equipment to be installed, all of which made it impossible for plaintiffs to proceed in an orderly fashion from building to building in accordance with their work schedules.

As a result of these conditions, plaintiffs, on March 3, 1952, a year after commencing work, requested permission to suspend all work on the contract, complaining that they had been subject to

"  *   *   *   considerable expense due to the fact that in every building

where government equipment was involved in our contract, we were never able to start a job and carry it through * * *.

\* \* \* \* \* \*

" * * * This delay has resulted in a loss to our Company of approximately $150,000.00. We feel that we would not have sustained this loss had we been able to carry out our work as set out in the plans and specifications.

" * * * unless the job is suspended we will be penalized further. We also submit this letter as a claim to recover our losses as stated above.[1]

The contracting officer granted the requested suspension on June 16, 1952, effective June 14, 1952, and at about the same time, on June 12, 1952, extended the contract 180 calendar days, which extension plaintiffs agreed would not result in any change in the contract price as previously modified.

In a letter with enclosures, dated August 11, 1952,[2] plaintiffs submitted a detailed description of their losses, with an itemized list of the various elements which amounted to a total claim of $101,-381.56, as follows:

| | | |
|---|---|---:|
| "I. | Loss of efficiency of labor due to delays | $ 54,643.13 |
| II. | Extra overhead due to the delays | 25,238.25 |
| III. | Extra equipment cost due to the delays | 8,987.00 |
| IV. | Wage increases incurred due to the delays | 6,890.76 |
| V. | Extra payroll insurance and taxes on No. I | 4,173.30 |
| VI. | Job insurance | 834.37 |
| VII. | Extra storage space | 453.00 |
| VIII. | Loss of material | 161.75 |
| | | $101,381.56" |

In submitting this claim, plaintiffs made the following statement in their letter:

"Our claim for $101,381.56 does not include any claim for the amount of profit which we should have made on this project, it is merely a statement of the amount which we were damaged by the delay in the delivery of the Government equipment. *This is not a claim for profit or additional profit; we merely wish to recover the amount of our loss on the project.*" [Emphasis supplied.]

A 3-day conference was held at Camp Atterbury, January 12 to 14, 1953, to negotiate a settlement of plaintiffs' claim as presented in their letter of August 11, 1952. Present at the conference, in addition to plaintiffs' representatives, were the Purchasing and Contracting Officer, the Chief Engineer, and the Architectural Engineer. As a result of this conference, the parties entered into Modification No. 10 on March 10, 1953, which provided that the contract was declared to be modified under the "Suspension of Work" clause to increase the contract price in the amount of $87,270.92. After reciting the losses resulting from the extensive delays occasioned by the Government in furnishing equipment, the agreement declared "[t]he contract price shall be increased in the lump sum of $87,270.-92 *which amount shall constitute full compensation for said delays.*"[3] [Emphasis supplied.]

Plaintiffs assented to Modification No. 10 without reservation or qualification.

The suspension was lifted in January 1953, and all work required under the contract as modified was completed in

1. Letter from plaintiffs to Purchasing Officer, March 3, 1952, (Joint Ex. 4).

2. Letter from plaintiffs to Post Engineer, August 11, 1952, (Joint Ex. 9).

3. Joint Ex. 1.

March 1953. Subsequently, on July 15, 1953, the plaintiffs certified that the *correct and just* total completed contract price (which included Modification No. 10) was $979,432.00, of which amount they had already received on account the sum of $954,316.09, leaving a balance due them of $25,115.91. Plaintiffs received payment for this amount on November 11, 1953.

On February 24, 1956, plaintiffs demanded that defendant pay them an additional $90,893.44. The Comptroller General denied this claim on June 13, 1956. Thereafter, on February 25, 1957, plaintiffs filed a petition in this court demanding an identical amount and alleging it to be damages resulting from defendant's delays and administrative coercion.

At pretrial conference they eliminated that portion of their claim described as out-of-pocket loss, thereby reducing their claim to $81,000, which is alleged to be the reasonable profit contemplated under the original contract and lost because of defendant's unreasonable delays. In their response to defendant's motion for summary judgment, plaintiffs appear to have abandoned their allegation that they were coerced into accepting Modification No. 10, and we will so treat their petition for purposes of the motions before us at this time.[4]

■ Defendant moves for summary judgment on the ground that the settlement under Modification No. 10 was an accord and satisfaction completely discharging plaintiffs' claim for damages due to excessive delays in obtaining Government-supplied equipment. We think defendant is correct.

Modification No. 10, which was mutually agreed to by the parties, stipulated that, because of the extensive delays occasioned by the Government, plaintiffs were entitled to an equitable adjustment in the contract price in the sum of $87,270.92, which amount (in the express words of the agreement) *"shall constitute full compensation for said delays."* [Emphasis supplied.] And in July 1953, plaintiffs, in applying for the final payment under the contract which amounted to $25,115.91, certified that the total contract price, which included the increase granted in Modification No. 10, was *correct and just.*[5] In November they received and accepted that amount as final payment under the contract, without protest or reservation.

There is no ambiguity in language which states that a certain sum shall constitute full compensation for delays. From this—and the unequivocal conduct of the parties—we must conclude that plaintiffs knew that their claim for delays would be fully discharged upon payment of the $87,270.92. Full negotiation of the differences between the parties resulted in an agreement, evidenced in a written instrument, to accept an amount which was less than that originally claimed in full settlement of their expenses and losses from delays. Subsequently defendant paid the agreed amount in satisfaction of the compromised claim and plaintiffs accepted it. The agreement contained no specific reservation by them of a right to seek other damages for delays. Having voluntarily agreed to the modification and having accepted its benefits as "full compensation" for delays, plaintiffs are bound by it.[6]

Plaintiffs seek to avoid summary judgment by asserting that in making settlement that element of their claim now sued upon (loss of profit) was expressly reserved for subsequent consideration, that any claim for loss of profit would have been premature at the time of the Modification No. 10 agreement, since the contract was then incomplete, and that a claim such as theirs for unliquidated damages was not within the authority of the contracting officer.

Plaintiffs' contention that there was an *express* reservation of loss of profit is

4. Plaintiffs' Response to Defendant's Motion For Summary Judgment, p. 7.

5. Joint Ex. 3.

6. Langoma Industries, Inc. v. United States, 135 F.Supp. 282, 133 Ct.Cl. 248, 253 (1955).

based on language in their letter of August 11, 1952, previously quoted: "This is not a claim for profit or additional profit; we merely wish to recover the amount of our loss on the project."

■ They contend that by this language they reserved a claim for loss of profit. Clearly this is not an express reservation of a claim for profit. In fact, we think it might more reasonably be read as a renunciation of any claim to profit. From the language plaintiffs used in their claim on August 11, 1952, it was natural and reasonable for the contracting officer to conclude that he had before him for consideration the plaintiffs' entire claim. He recommended all eight items of the claim be allowed in full except for one item, that pertaining to extra overhead, which he recommended be reduced approximately $14,000.

■ The contract price was increased according to these recommendations, and it can hardly be said that it was not a generous settlement when measured by the amount actually claimed. Yet the contracting officer's recommendations as to the eight items actually presented might well have been different had he known that plaintiffs planned to present (if they did so plan) three years later a ninth item of alleged loss amounting to $81,000 which, stemming as it did from the same delays, by right should have been a part of the same equitable adjustment. He could not properly evaluate the claims before him without knowing that other claims were being reserved for future action. Having led the contracting officer to believe that there would be no claim for loss of profit, plaintiffs should be estopped from asserting it now.

If plaintiffs had intended to leave a claim for profits open, their intention to do so should have been made manifest and explicit,[7] not necessarily in the preliminary letter but certainly in the written agreement incorporating the actual settlement.

Nor do we find any merit in plaintiffs' argument that they could not have made a claim for reasonable profits lost along with the eight items of loss actually claimed on August 11, 1952, on the ground that the contract was at that time still incomplete. As a matter of fact, plaintiffs' claim was based upon damages for delays *prior* to June 30, 1952. On that date the contract as modified was 94 percent complete. Their certified accountant estimated that as of that date the dollar amount of unfinished work under the contract amounted to approximately $28,000. The accountant, in working up his profit and loss statement as of that date, assumed that there would be neither profits nor losses on the remaining work, a relatively small amount as compared to a total contract price at that time of $895,980.08.

■ Plaintiffs apparently rely on the rule to the effect that in a public contract executive officers representing the Government therein are not authorized to entertain and settle claims for unliquidated damages,[8] either because of lack of statutory authority to do so,[9] or because of lack of appropriations to pay damages. They cite the Continental Illinois National Bank & Trust Company case in which this court said: "The departments are authorized to spend money only for the purposes for which it is appropriated by Congress. Funds are not appropriated to pay damages for breaches of contracts." [10]

7. United States v. William Cramp & Sons Ship & Engine Building Company, 206 U.S. 118, 128, 27 S.Ct. 676, 51 L.Ed. 983 (1907).

8. William Cramp & Sons Ship & Engine Building Company v. United States, 216 U.S. 494, 500, 30 S.Ct. 392, 54 L.Ed. 587 (1910); Langevin v. United States,

100 Ct.Cl. 15, 31 (1943); Power v. United States, 18 Ct.Cl. 263, 275 (1883).

9. Power v. United States, 18 Ct.Cl. 263, 275 (1883).

10. Continental Illinois National Bank & Trust Co. of Chicago v. United States, 115 F.Supp. 892, 897, 126 Ct.Cl. 631, 640 (1953).

■ To take advantage of this rule, plaintiffs seek to establish their claim as one for damages and therefore cognizable only in the courts in an action for breach of contract, as distinguished from a claim under the contract which must be determined by the contracting officer in the form of an equitable adjustment. It should be noted parenthetically, however, that out-of-pocket losses caused by the delays were treated by the parties at the time as a payment under the contract, that is, as an equitable adjustment under the "Suspension of Work" clause. Even if such a distinction could be validly maintained it would be of little aid to the plaintiffs on the facts of this case. We are dealing here not with a *unilateral* determination by the contracting officer, but with a mutual agreement between the parties. Where that executive officer of the Government who is charged with administering a contract does in fact reach a mutual agreement with the contractor settling a claim for unliquidated damages flowing from Government delays, and the agreed amount is actually paid from funds appropriated for that procurement, such settlement is conclusive of all elements of the claim, except those specifically reserved by the parties to the contract.

As long ago as 1875 the Supreme Court considered the power of the executive department to effect settlements and, in the case of United States v. Corliss Steam-Engine Company,[11] on appeal from this court, held that the executive department, acting through its duly authorized delegate, had inherent authority to enter into a binding agreement settling a claim which, because of the absence of a contract clause permitting or requiring payment, was necessarily one for damages for breach of contract. That case involved two contracts for installing engines on naval vessels. When still uncompleted, the Navy ordered the contractor to stop all work on the contracts. Since there was no reservation of a right to terminate, this was a breach of contract. The contractor offered, in full settlement of its claim for damages as a result of the breach, to deliver the uncompleted machinery to the Navy in return for payment in the amount of $259,-068.40 (the contract price plus extra work minus the sum of $45,000 allowed as a deduction for not having to install the machinery as contemplated in the contract).

In lieu of payment, due to insufficient funds, the contractor was issued a certificate of indebtedness for the full amount of the settlement pending a further appropriation by the Congress. Subsequently both the Congress and the Navy sought to reduce the settlement by $110,-000. In a suit to recover the full amount as provided in the agreement, the Government attempted to avoid its obligation under the settlement on the ground that the bureau chief was without authority to make the settlement and his act, therefore, did not bind the Government. The Government argued that, when a contract is broken by the Government, thereby entitling the contractor to whatever damages are provided by law, it becomes a matter solely for judicial determination in the Court of Claims; that the result of the order to cease work was "virtually to refer the matter at once to the tribunal devised by Congress to represent public justice in disputes about money between plaintiff and the United States."[12] The court rejected this argument, holding that when such a settlement is made upon a full knowledge of all the facts, without concealment, misrepresentation, or fraud, it is equally binding upon the Government and the contractor.[13]

The Supreme Court found the necessary authority in the Act of April 30, 1798,[14] which created the Navy Department and defined the duties of the Secretary. Under the statute, his duties included the construction and equipment of war vessels. From this duty was de-

11. 91 U.S. 321, 23 L.Ed. 397 (1875).

12. 11 Ct.Cl. 126, 142 (1875–1876).

13. 91 U.S. 321, 323, 23 L.Ed. 397 (1875).

14. Act of April 30, 1798, 1 Stat. 553.

rived the implied authority to enter into numerous contracts, since it could not be discharged without doing so. The power to make contracts carried with it the power to suspend them and to agree to settlements with contractors, for if he could agree initially upon the amount of compensation for full performance, he had equal authority to agree upon compensation for partial performance, i. e., damages for breach of contract.

Subsequently the Supreme Court considered a case [15] where the contractor executed without reservation a release, as provided in the contract, of all claims "under and by virtue of the contract," in order to obtain the final payment of the contract price then due it. Although the contract called for completion of the work in 3 years, it had taken 5 years because of Government delays. The contractor claimed, after giving the release, seven items of damage resulting from the delays in the total amount of $480,231.90. It brought suit in this court obtaining judgment for part of its claim, which on appeal was reversed by the Supreme Court. Before the Supreme Court the contractor's argument was similar to plaintiffs' in the case at bar. It argued that the release it gave under the contract did not encompass its claim for unliquidated damages for breach of contract, because " * * * unliquidated damages arising from the breach of the contract on the part of the United States, which were not only not presented or considered, but were of such a character that the Secretary of the Navy had neither the right, authority, or jurisdiction to consider, adjust, or pay." [16] The Supreme Court, in sustaining the release as conclusive of all of the contractor's claims against the Government, necessarily sustained the power of the Secretary either to entertain the claim and provide for it, or at least to consent that the claim should be reserved for later consideration. In the second Cramp case,[17] the Supreme Court upheld the validity of such a reservation in a release and thereby the power of the Secretary of the Navy to make such an agreement.

Significantly, plaintiffs have cited us no cases where this court has invalidated, on the ground of lack of authority, any agreement made by the contracting officer in the settlement of a claim for damages for breach of contract. On the contrary, we have held on numerous occasions that compromise settlements were valid and binding on both parties.[18] One of these, Badger Manufacturing Co. v. United States,[19] involved a settlement which included a claim for damages for delay in furnishing Government-furnished materials.

But aside from the question of the inherent authority of a contracting officer to settle unliquidated claims in the absence of specific provision for payment of such in the contract, we think that the "Suspension of Work" clause controls the rights and duties of the parties in the case at bar. The suspension clause converts an action for damages into a matter properly for determination and payment under and pursuant to the contract in the form of an equitable adjustment.[20]

The Congress has enacted legislation authorizing the department to enter into construction contracts. The contract in issue authorized suspension by the Government and an equitable adjustment for any damages and losses occasioned by un-

15. United States v. William Cramp & Sons Ship & Engine Building Co., 206 U.S. 118, 27 S.Ct. 676, 51 L.Ed. 983 (1907).

16. Id. 206 U.S. at 124, 27 S.Ct. at 678, 51 L.Ed. 983.

17. William Cramp & Sons Ship & Engine Building Co. v. United States, 216 U.S. 494, 30 S.Ct. 392, 54 L.Ed. 587 (1910).

18. Langoma Industries, Inc. v. United States, 135 F.Supp. 282, 133 Ct.Cl. 248 (1955); Coath & Goss, Inc. v. United States, 101 Ct.Cl. 653, 661 (1944); Seeds & Derham v. United States, 92 Ct.Cl. 97, 108–112 (1940), cert. denied 312 U.S. 697, 61 S.Ct. 731, 85 L.Ed. 1131.

19. 49 Ct.Cl. 538, 552 (1914).

20. Paragon Oil Co., ASBCA No. 3980, 58–2 BCA ¶ 1845, 7307.

reasonable delays caused by the Government. An equitable adjustment was made and agreed to by both parties and settlement was made pursuant thereto. No express reservation was made in the settlement agreement of any claim for lost profits. It was a complete accord and settlement. The claim plaintiffs now make grew out of the same contract and grows out of the same delays.

Defendant's motion for summary judgment is granted, plaintiffs' motion is denied, and the petition is dismissed.