**BANK UNITED OF TEXAS FSB, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 95–473 C.

United States Court of Federal Claims.

March 19, 1999.

Order Denying Modification July 2, 1999, 50 Fed.Cl. ——.*

Publication ordered April 6, 2001.

Walter B. Stuart IV, Vinson & Elkins L.L.P., Houston, Texas, with whom were John D. Taurman, Alden L. Atkins, Joseph E. Hunsader, David T. Hedges, Jr., James A. Reeder, Jr., and Christopher H. Meakin, for plaintiffs.

John J. Hoffman, with whom were John Davidovich, Katherine Kelly, Luke Levasseur, Bill Donovan, Andrea Gribble, Jeanne E. Davidson, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, and Frank W. Hunger, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

* See 1999 WL 33320959.

## OPINION AND ORDER

SMITH, Chief Judge.

This case is before the court on plaintiffs' motion for partial summary judgment as to liability and defendant's motion for a ruling on defendant's affirmative defense of accord and satisfaction. For the reasons discussed below, plaintiffs' motion for partial summary judgment as to liability is granted, and plaintiffs are granted summary judgment as to the affirmative defense of accord and satisfaction.

The case deals with the acquisition of a failed thrift, United Savings Association of Texas (Old United), from the Federal Savings and Loan Insurance Corporation (FSLIC) by a newly-formed thrift, now known as Bank United, and its holding companies in December 1988.[1] Plaintiffs contend that the passage of Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. 101–73, 103 Stat. 183, and its implementing regulations, breached the following promises by the government to plaintiffs: (1) to allow Bank United to operate under special modified capital requirements; (2) to count $110 million of subordinated debt as regulatory capital; and (3) to treat supervisory goodwill as regulatory capital. These promises, according to plaintiffs, were set forth in the contract documents: the Acquisition Agreement, signed by the FSLIC and United Savings Association, dated December 30, 1988; the Assistance Agreement, signed by the FSLIC, United Savings, USAT Holdings, Hyperion Holdings and Hyperion Partners, dated December 30, 1988; the Forbearance Letter from the Federal Home Loan Bank Board, dated February 15, 1989; FHLBB Resolution No. 88–1535, dated December 30, 1988, and the Regulatory Capital Maintenance Agreement, signed by the FSLIC, United Savings, USAT Holdings, Hyperion Holdings and Hyperion Partners, dated December 30, 1988.

This case has been governed by special procedures established in the wake of the Supreme Court's decision in *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). As part of that process, the court heard argument on a broad range of issues which had been raised in four of the *Winstar*-related cases. This culminated in the court's opinion in *California Federal Bank v. United States*, 39 Fed.Cl. 753 (1997). As a result of that opinion, the court ordered the government to show cause, in light of that opinion, why summary judgment should not be entered in cases, such as this one, where a motion for partial summary judgment as to liability had been filed. This generated a round of responsive briefing in an attempt to narrow further the issues left unresolved by the *California Federal* decision and by the *Winstar* decisions of the Supreme Court, the Federal Circuit, and the Court of Federal Claims.

In response to the court's show cause order, defendant identified two issues that remained unresolved in light of the *California Federal* opinion. The first is defendant's affirmative defense of accord and satisfaction, which defendant contends resolved any dispute regarding the government's obligation to allow plaintiffs to include subordinated debt as regulatory capital. The second is defendant's contention that the government did not breach any alleged capital forbearance because it never took regulatory action against the bank. Plaintiffs do not dispute that these two issues are still pending. The court will discuss each in turn.

## AFFIRMATIVE DEFENSE OF ACCORD AND SATISFACTION

In July 1990, Bank United's holding company requested regulatory approval from the Office of Thrift Supervision of a transaction designed to exchange its subordinated debt—now worthless as regulatory capital—for notes which would qualify as regulatory capital. As described by Lewis S. Ranieri,

---

1. At the time of the transaction, Bank United, then known as United Savings Association of Texas FSB (and later as Bank United of Texas FSB) was owned by USAT Holdings, Inc. Hyperion Holdings Inc., in turn, owned 100 percent of the voting stock of USAT Holdings Inc. Hyperion Partners L.P. owned 100 percent of the stock of Hyperion Holdings. In 1996, USAT Holdings changed its name to Bank United Corp., and Hyperion Holdings Inc. was merged with and into Bank United Corp. Consequently, the plaintiffs are Bank United, Bank United Corp., and Hyperion Partners L.P.

Chairman and Chief Executive Officer of the holding company in his July 13, 1990 letter requesting approval of the transaction:

The proposed transaction involves the exchange of 15% Subordinated Capital Notes due 1999 (the "Subordinated Notes") issued by United Savings Association of Texas FSB ("USAT") for 15 ¾% Senior Notes (the "Senior Notes") to be issued by USAT Holdings Inc. ("USAT Holdings"), the sole stockholder of USAT (the "Exchange"). As a result of the Exchange, USAT Holdings will hold all of the outstanding Subordinated Notes and the existing holders of Subordinated Notes will hold the same amount and proportion of Senior Notes as they had held of Subordinated Notes. At the same time, the Subordinated Notes will be amended to permit prepayment without penalty.

The Exchange would replace up to $110 million of debt that is basically useless as capital—and that drains an estimated $6 million per year from USAT's earnings—with an equal amount of core capital, leading to institutions with core capitalization and profitability. The result would also accomplish the intention of the parties in December 1988, i.e., the $110 million would count as capital for all regulatory purposes.

On August 20, 1990, the OTS approved the transaction as set forth in Mr. Ranieri's letter. As defendant notes, at the time the request was made (and ultimately approved), FIRREA had been passed and the subordinated debt could no longer be included in core capital. Hence, according to the government, if any breach did occur by the passage of FIRREA, "that breach was cured when OTS allowed plaintiffs to exchange the subordinated debt." Def.'s 120–Day Resp. to Pls.' Mot. for Partial Summ. Id. at 21.

■ "An accord and satisfaction operates to extinguish, discharge, or terminate an existing right." Westerhold v. United States, 28 Fed.Cl. 172, 174 (1993). In order to prove a valid accord and satisfaction, the defendant must show the following: (1) proper subject matter; (2) competent minds; (3) a meeting of the minds; (4) consideration; and (5) the acceptance of payment or performance in satisfaction of a claim or demand which is a bona fide dispute. Id. at 174–75.

■ Defendant contends that all elements are present here. Plaintiffs made an offer, which was accepted, and the intention of the parties to settle the dispute is clearly demonstrated in Mr. Ranieri's letter to the OTS, which states that this was an effort to "accomplish the intention of the parties in December 1988, i.e., the $110 million would count as capital for all regulatory purposes." Moreover, defendant contends that, since the agreement evidenced no reservation of rights, plaintiffs cannot now assert a claim for damages, because such reservation must be manifestly and explicitly set forth in the settlement or modification. Cannon Constr. Co. v. United States, 162 Ct.Cl. 94, 101, 319 F.2d 173, aff'd 162 Ct.Cl. 94, 319 F.2d 173, 177 (1963).

As is becoming an all too familiar pattern in the Winstar related cases, defendant cites settled legal rules and attempts to transmute the facts to satisfy the legal rules. Just as one cannot turn iron into gold, one cannot turn facts that flatly contradict the existence of an accord and satisfaction into facts that establish one. Plaintiffs argue that three of the five requirements are not met in this case: there is no meeting of the minds; there is no consideration; and there is no acceptance of payment or performance in exchange for a claim or demand in bona fide dispute. Moreover, as plaintiffs point out, the forbearance agreement and Regulatory Capital Maintenance Agreement prohibited Bank United from prepaying the subordinated debt without regulatory approval, and OTS approval was required by regulation for certain aspects of the transaction. Hence, plaintiffs were requesting approval as required by contract and regulation.

Simply put, there is no evidence in the documents or elsewhere than that these were anything other than a regulatory request and approval. The court need not look at plaintiffs' affidavits, which defendant contends are self-serving, to come to that conclusion. Nothing in the documents themselves suggests that plaintiffs and defendant came to a meeting of the minds to settle a bona fide dispute over the treatment of subordinated

debt as regulatory capital. Further, there is no suggestion in the letters that any consideration was exchanged. Indeed, the linchpin of the defendant's argument that the parties effected an accord and satisfaction—Mr Ranieri's statement in the request for approval that "[t]he result would also accomplish the intention of the parties in December 1988, *i.e.,* the $110 million would count as capital for all regulatory purposes"—actually suggests mitigation, not accord and satisfaction. The sentence indicates that there is no bona fide dispute as to the parties' respective rights and obligations, and that plaintiffs are seeking regulatory approval to fill a capital hole which would be otherwise unnecessary had the government not breached its contract.[2]

The fact that the government is the breaching party and also a regulator does not transform regulatory action necessitated by the breach into a contractual accord and satisfaction.[3] Simply put, plaintiffs needed to obtain regulatory approval to engage in a transaction designed, in part, to put Bank United in the same capital position *vis a vis* the $110 million that they were entitled to under their contract prior to the passage of FIRREA. It does not suggest that this regulatory exchange operated as a waiver of any claims against the government for damages that may have resulted from the breach. While his transaction certainly may be relevant to the quantum of damages, its approval is not an accord and satisfaction. Further, it is irrelevant that there was no reservation of rights in the documents of claims emanating from the breach since the documents do not evidence any accord and satisfaction. For these reasons, plaintiffs are granted summary judgment as to defendant's affirmative defense of accord and satisfaction.

2. The affidavit of Billy Wood, the Office of Thrift Supervision (OTS) examiner, regarding his interpretation of Mr. Ranieri's statements, does nothing to alter the court's conclusion. His affidavit states that the OTS approval "would resolve the issue/problem arising from the fact that FIRREA precluded the use of subordinated debt as regulatory capital." Not surprising, since this was the stated reason in Mr. Ranieri's letter. Tellingly, though, is what the affidavit does not say: Mr. Wood gives no indication that this approval was

## NO BREACH OF THE CAPITAL FORBEARANCE

■ Defendant argues that, because the government allegedly never took regulatory action against Bank United for failure to meet capital requirements, there was no breach. As the government states: "If the Government did not exercise its authority to take regulatory action against the bank for the bank's failure to meet certain regulatory capital requirements, then the Government upheld its end of the 'bargain' and never breached its promise." Def.'s Resp. to the Court's Order to Show Cause at 22.

Plaintiffs argue, first, that the government did take regulatory action, and second that it is irrelevant regardless. Plaintiffs point to OTS Thrift Bulletin 38–2, which eliminated capital forbearances such as the one in this case. Plaintiffs also argue that OTS did take regulatory action against the bank in December 1990, by requiring Bank United to infuse additional capital to meet FIRREA's capital ratios. This action would not have been necessary had the capital forbearance been honored.

More importantly, though, it does not matter that regulators took no enforcement action against Bank United. This is true because the government did repudiate its duty to forbear from enforcing existing regulatory capital requirements so long as Bank United met the modified ones set forth in the forbearance letter. Bank United met FIRREA's requirements because the regulators ordered it to do so, notwithstanding the contract. As plaintiffs put it: "If the government's argument were right, Bank United should have defied FIRREA and the orders of the regulators and operated at the lower capital ratios set forth in the Capital Forbearance. Had it done so, Bank United

conditioned or bargained for in exchange for the release of plaintiffs' claims.

3. The government might suggest that this is inconsistent with the court's *California Federal* decision, because it continues to insist that the court has determined that mere regulatory approval creates a binding contractual commitment by the government. The court has never indicated that regulatory approval alone creates a contract.

would have suffered prompt enforcement action, disruption and seizure. There is no legitimate reason to require a plaintiff to put its entire existence into peril in the face of the government's breach." Pls.' Resp. to Def.'s Show Cause Mem. at 12. The point is that the capital forbearance operates as a modified capital requirement, which plaintiffs bargained for and which plaintiffs could not rely upon anymore. The fact that plaintiffs were able to keep regulators somewhat at bay notwithstanding the breach does not mean that the government honored its promise.[4] Plaintiffs are entitled to damages that resulted from the need to meet the enhanced capital requirements that they otherwise would not have had to meet had the government honored the capital forbearance promise. The issue is not whether there was a breach, but whether, and to what extent, damages flowed from it. This requires a trial.

Lastly, defendant makes a recently articulated challenge to what it considers plaintiffs' improper interpretation of the scope of the capital forbearance. In its second show cause brief, defendant spells out its interpretation of the forbearance as follows:

The plain language of the forbearance shows that it would be triggered only when:

1) the thrift has failed to meet regulatory capital requirements;

2) the failure is caused "solely" by losses on non-covered assets (or certain liabilities) acquired from the failed thrift; and

3) the thrift meets the minimum "percentage floor" set forth in the forbearance letter for the applicable time period.

Def.'s Resp. to Pls.' Prop. Orders at 15. Thus, according to defendant, if the thrift fails to meet regulatory capital requirements, one must determine first if it was caused solely by the specified assets and liabilities and then whether it meets the percentage floor set forth in the forbearance letter.

4. By the government's logic, if an insurance company told a policy holder that it would not honor its contract to provide insurance, and the policy holder ultimately never had need to file a claim, then there could be no breach. This, of

Plaintiffs make two criticisms of defendant's argument, both valid. First, plaintiffs point out that the government construction of the forbearance ignores the provision that the government will forbear from enforcing existing capital regulations if the deficit is caused solely by "the assumption of the liabilities of the Acquired Institution as of the Effective Date." Since the forbearances, it comes as no surprise, were designed to enable Bank United to survive the absorption of the liabilities of Old United, and continue leveraging notwithstanding the assumption of liabilities, it seems apparent that the modified capital standards in the forbearance letter are operative at all times, and require no separate showing. This certainly is buttressed by the actions of the parties. There is no evidence, for instance, that Bank United had to make a showing that the lower capital levels were caused solely by the assumed liabilities of Old United. Instead, regulators accepted that Bank United merely had to meet the capital requirements set forth in the forbearance letter, without any independent and separate showing. *See, e.g.,* May 8, 1989 OTS Report of Examination, which explains the forbearances purely in terms of meeting the percentages set forth in the forbearance letter, without any reference to the mandatory showing defendant now contends was required.

Second, as plaintiffs make clear, even were the court to accept defendant's more recent and limited understanding of the scope of the forbearance, which the court does not, that would only go to the issue of damages, and not, once again, to the issue of whether plaintiffs had a contractual forbearance right breached by the passage of FIRREA.

## CONCLUSION

Upon consideration of plaintiffs' short-form motion for partial summary judgment on liability, defendant's motion for a ruling upon its affirmative defense of accord and satisfaction, and the parties' submissions in connection with those motions, as well as the show

course, makes no sense. The question in this example, as in this case, is whether that repudiation of the contract caused the non-breaching party damages.

cause filings generated after the court's decision in *California Federal,* and for the reasons set forth in this opinion and the court's opinion in *California Federal,* it is hereby

ORDERED that plaintiffs' motion for partial summary judgment is granted and that plaintiffs are granted summary judgment on liability for breach of contract in Count 1 of the Complaint; and it is further

ORDERED that, with regard to defendant's motion for a ruling upon its affirmative defense of accord and satisfaction, defendant's motion for summary judgment as to the affirmative defense is denied, and plaintiffs are granted summary judgment as to that defense; and it is further

ORDERED that, pursuant to RCFC 77(f), the Omnibus Case Management Order (September 18, 1996) and the Priority Cases Pretrial Scheduling Order (April 2, 1997), that this case be reassigned to Judge James T. Turner as Trial Judge for all further proceedings, except for requests for clarification of this opinion, which will be considered by Chief Judge Smith, and except for defendant's pending motion for enforcement of this court's order of February 3, 1999, which will be considered by Discovery Judge Miller.

**IT IS SO ORDERED.**

